IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA FRANK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-34 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| THE PNC FINANCIAL SERVICES GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

McLAUGHLIN, SEAN J., Chief District Judge.

Patricia Frank ("Plaintiff" or "Frank") filed suit against PNC Bank, N.A. (named in the Complaint as "The PNC Financial Services Group, Inc.") ("Defendant" or "PNC") alleging that PNC terminated her employment based on her age, religion, and disability in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"). On November 16, 2012, PNC filed a Motion for Summary Judgment, which is presently pending. (ECF No. 29). Subsequently, at oral argument on July 2, 2013, Frank withdrew her religious discrimination claim. For the following reasons, the Court will grant PNC's motion as to the remaining claims based on age and disability discrimination. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### I.   BACKGROUND

Frank was born in 1949 and was 60 years old at the time of her termination from PNC. (Deposition of Patricia Frank ("Frank Dep.") at 11). In 2004, National City Bank, N.A.

1

("National City"), a predecessor of PNC, hired Frank as a Branch Customer Service Representative ("Teller"). (*Id.* at 17). Following PNC's acquisition of National City in 2008, Frank remained with PNC as a Teller Supervisor at the Pittsburgh Avenue branch office in Erie, Pennsylvania ("Pittsburgh Avenue Branch"). (*Id.* at 19-21).

As Teller Supervisor, Frank was responsible for performing standard teller responsibilities such as servicing customers, facilitating deposits and withdrawals, and handling cash. (*Id.* at 23-28). Additionally, she performed leadership functions, including training tellers, auditing teller cash drawers, and ensuring that tellers followed proper cash handling policies. (*Id.*). Starting in March of 2010, Frank reported to Branch Manager, Karen Malick ("Malick"). (*Id.* at 22). All of the Tellers at the Pittsburgh Avenue Branch reported to Frank as Teller Supervisor. (*Id.*).

PNC requires all Tellers and Teller Supervisors to perform "cash balancing" at the end of each day. (*Id.* at 30-32; Ex. 3-4). "Cash balancing" is the process of calculating and settling the final cash figure to ensure that the cash in the teller's drawer equals the amount reflected on the bank's computer system for that day. (*Id.*). According to PNC policy, tellers may need to "buy" or "sell" cash to and from one another to meet the needs of their cash drawers ("buy/sell"). (*Id.* at 30; Ex. 3). PNC protocol provides that buys/sells in excess of $100.00 must be recorded at the time the cash is exchanged. (*Id.* at 32; Ex. 3). If a teller fails to record the buy/sell transaction at the time the cash is exchanged, the teller cannot correct the discrepancy after the fact, but rather must accept the overage or shortage at the end of the day. (*Id.*).

Following PNC's acquisition of National City, PNC provided Frank with training on PNC's policies regarding "cash balancing" and "buying and selling cash," as well as its policy against "force balancing." (*Id.* at 35-37). "Force balancing" is the process by which a teller

2

manipulates his or her cash figures to force the cashbox into balance. (*Id.* at 41; Ex. 5). PNC policy provides as follows:

> Under no circumstances should a teller, teller supervisor, manager, or regional manager force balance. Force balancing will result in disciplinary action up to and including discharge.
>
> When a teller discovers a processing error and is unable to reverse the transaction, the teller must accept the difference (overage or shortage) caused by the error . . . .
>
> Do not . . . process an offsetting transaction unless specifically instructed to do so by the Branch Support Hotline, Centralized Reconcilement Service Team (CRST), or Teller Support.

(*Id.* at 40-41 at Ex. 5; Declaration of Peggy Atkinson ("Atkinson Decl.) at Ex. 3). According to PNC's Bonding Policy, "[s]ome examples of dishonest acts that may suspend bond coverage and/or result in termination of employment include . . . false proofing/force balancing." (Atkinson Decl. Ex. 4 at PNC0349).

In or around June of 2010, approximately one month prior to Frank's termination, Frank informed Malick that she suffered from multiple sclerosis ("MS"). (Frank Dep. at 105, 122-24, 131-32). Frank was diagnosed with MS in 2003 and, while working at PNC, she sometimes experienced flu-like symptoms as a side effect of her medication. (*Id.* at 122, 126-29). Frank's MS was otherwise asymptomatic. (*Id.*).

At approximately 4:30 p.m. on July 28, 2010, Frank attended a group teleconference held by the Market Loss Prevention Manager concerning, *inter alia*, PNC's buy/sell policy and prohibition against force balancing. (*Id.* at 91-95). According to Frank, she had the call on speakerphone and was not paying close attention to everything that was being said. (*Id.* at 91-92). Following the call, Frank discovered a shortage of $500 in her cash drawer. (*Id.* at 67-70). She also learned that Julie Deringer ("Deringer"), a part-time Teller at the branch, had an

overage of $500 resulting from a buy/sell transaction of five dollar bills between them earlier in the day. (*Id.*). Frank then advised Malick of the $500 buy/sell discrepancy with Deringer and informed her that she would process a recovery for that sum and would notify the Loss Prevention Department by email. (*Id.* at 68, 72-73). Malick was on the telephone at the time and, according to Frank, replied "okay." (*Id.* at 73). Malick disputes, however, that she gave Frank permission to process the recovery. (Deposition of Karen Malick ("Malick Dep.") at 42). Rather, Malick testified that the following exchange took place:

> I said to her I don't think you can process a recovery for a buy/sell error. She responded that she had heard that on the conference call that she just took a few short hours prior. And I said well, before you process it call loss prevention just to make sure.

(*Id.* at 43).

At 6:36 p.m., Frank emailed the Erie/Youngstown Market Loss Prevention Department to advise them of the $500 buy/sell discrepancy and stated that she would process a recovery of the differences. Specifically, Frank stated as follows:

> Julie was over $500[.]
> And I was short $500[.]
> We did not process a buy/sell for $5's.
> I will do a recovery for the amount.

(*Id.* at Ex. 13 at PNC0269). At 6:37 p.m., one minute after her email, Frank processed the recovery for her $500 shortfall. (*Id.* at 69-70, 78). At 6:39 p.m., Frank processed a recovery for Deringer's overage. (*Id.* at 78-79). Deringer, on the other hand, accepted her overage and did not process a recovery. (Deposition of Julie Deringer ("Deringer Dep.") at 12).

On July 30, 2010, Market Loss Prevention Manager Audra Sisti ("Sisti") forwarded Frank's July 28, 2010 email to Malick. (Deposition of Karen Malick ("Malick Dep.") at 39-41, 139-141, Ex. 6). In the email, Sisti said, "[t]here should be no recovery for this outage below. It

4

was a Buy/Sell error . . . . Please let me know what [Frank] did." (*Id.* at Ex. 6). Sisti also forwarded the email to Peggy Atkinson ("Atkinson"), Senior Employee Relations Specialist. (Atkinson Decl. ¶ 12). Atkinson, who was 61 at the time, then initiated an investigation into the matter. (Atkinson Decl. ¶ 3). As part of her investigation, Atkinson interviewed Malick, Sisti, and Frank. (*Id.* ¶ 15). According to Malick, she had not given Frank express permission to process the recovery and, instead, advised Frank to email the Loss Prevention Department. (Malick Dep. at 42-43). Sisti also told Atkinson that she had advised employees during the July 28, 2010 teleconference not to process recoveries in the event of a buy/sell transaction error. (*Id.*) During Atkinson's interview of Frank, Frank admitted that she processed the recovery on July 28, 2010 in order to correct a buy/sell transaction error that occurred earlier in the day, but denied that what she did constituted "force balancing." (Frank Dep. at 96-97, 100-101; Atkinson Decl. ¶ 16). Rather, Frank contends that she did not force balance because "she accepted her difference, posted the difference such that it appeared of record, completed a recovery with permission from [Malick], and informed the loss prevention department, according to PNC policy." (Frank's Counterstatement of Additional Undisputed Material Facts ¶ 21).

Following her investigation, Atkinson determined that Frank violated the PNC Code of Ethics by engaging in force balancing in violation of PNC policy. (Atkinson Decl. ¶ 19). Atkinson based her determination, in part, on Frank's disregarding the advice provided on the July 28, 2010 teleconference held by Loss Prevention, as well as other trainings on PNC policy following the operational conversion from National City to PNC. (*Id.*) Atkinson also concluded that Frank acted dishonestly by emailing Loss Prevention after business hours about the shortage and her proposed recovery, and then proceeding to process the recovery without waiting to receive a response. (*Id.*). Atkinson then conferred with Sisti, Regional Manager Christine

Bernatowicz ("Bernatowicz"), and Market Manager Christopher Sobel, and advised them that, based upon her investigation, PNC would have to terminate Frank. (Frank Dep. at 102; Atkinson Decl. ¶ 20). On August 4, 2010, Atkinson informed Frank of her termination. (Frank Dep. at 100). Frank was 60 years old. PNC selected Jamie Wheeler, a 36-year-old, to replace Frank as Teller Supervisor following her discharge. (Compl. ¶¶ 17-19). On January 26, 2012, Frank filed the instant action against PNC.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A disputed fact is "material" if it could affect the outcome of the suit, given the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). Nonetheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This requirement upholds the underlying purpose of the rule, which is to avoid a trial "in cases where it is unnecessary and would only cause delay and expense." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (1976). Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary

judgment is appropriate. *Celotex*, 477 U.S. at 322; *Wisniewski, v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

### III. DISCUSSION

*Burden Shifting Framework*

In analyzing Frank's discrimination claims under the ADEA and ADA, the court's analysis is guided by the familiar burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1] Under the *McDonnell Douglas* burden shifting analysis, a complainant carries the initial burden of establishing a *prima facie* case by demonstrating that: (1) she is a member of a "protected class"; (2) she is "qualified for the position"; (3) she "was subject to an adverse employment action despite being qualified"; that occurred (4) under circumstances that raise an inference of unlawful discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 & n. 7 (3d Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802; *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 348 n. 1, 352, 356 (3d Cir. 1999)) (footnote omitted). The question whether a plaintiff has established her *prima facie* case is a question of law to be determined by the court. *Sarullo*, 352 F.3d at 797.

If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). Once the employer does so, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were merely a pretext for discrimination, and not the true

---

[1] The *McDonnell Douglas* analysis applied to claims of employment discrimination under Title VII is also applied to claims of employment discrimination under the ADEA and ADA. *See, e.g., Colwell v. Rite Aid Corp.*, 602 F.3d 495, 500 n. 3 (3d Cir. 2010); *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009); *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

motivation for the adverse employment action. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981)).

The *McDonnell Douglas* framework does not apply in employment discrimination cases where there is direct evidence of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). In cases in which direct evidence of discrimination is presented, there is no need for an "inference" of discrimination, since the discrimination itself is transparent. In this case, however, Frank has presented no direct evidence of discrimination. Accordingly, the Court will analyze Frank's claims using the *McDonnell Douglas* framework.

### *Age Discrimination Claim*

Frank's first claim is that PNC terminated her employment because of her age, in violation of the ADEA. The ADEA prohibits employers from "discriminating against individuals in hiring, discharge, compensation, term, conditions, or privileges of employment on the basis of their age." *Duffy v. Paper Magic Grp. Inc.*, 265 F.3d 163, 167 (3d Cir. 2001) (citing 29 U.S.C. § 623(a)(1)). To establish a *prima facie* case of age discrimination, a plaintiff must first show that: (1) she is forty years of age or older; (2) the defendant took an adverse employment action against the plaintiff; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).

We conclude that Frank has produced evidence sufficient to establish her *prima facie* case. It is undisputed that she was a member of a protected class when she was terminated. She was replaced by a worker, Jamie Wheeler, who was significantly younger at age 36. In addition,

Frank had five years of experience working as a Teller and Teller Supervisor for the position in question and was regarded as a competent employee. (Frank Dep. at 20-21; Malick Dep. at 128, 139). *See, e.g., Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 332 (3d Cir. 1995) (finding that employee was qualified for position where he had twenty-three years of experience and an overall rating of "competent"); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 730 (3d Cir. 1995) (employee "had the objective experience and education necessary to qualify as a viable candidate for the positions he held").

Having made out her *prima facie* case of age discrimination, the burden shifts to PNC to "articulate some legitimate, nondiscriminatory reason" for Frank's termination. *McDonnell Douglas*, 411 U.S. at 802. PNC satisfies its burden of production "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *See Fuentes*, 32 F.3d at 763 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)). In other words, PNC must clearly set forth, through the introduction of admissible evidence, the "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507. PNC need not prove that the tendered reason actually motivated its behavior because the ultimate burden of proving intentional discrimination rests with Frank. *Id.* (citing *Burdine*, 450 U.S. at 253).

Here, PNC has met this burden by claiming that it terminated Frank "for violating PNC's policy prohibiting force balancing." (Atkinson Decl. ¶ 20). Specifically, according to Atkinson, "Frank had violated PNC's Code of Ethics not only by engaging in force balancing in violation of PNC policy, but also by doing so in knowing and deliberate disregard of the advice she had received during the July 28, 2010 teleconference held by Sisti of the Loss Prevention Department

as well as a number of other trainings and coachings on PNC policy following the operational conversation from National City." (*Id.* ¶ 19). Additionally, Atkinson concluded that Frank "acted improperly in emailing Loss Prevention about the shortage and her proposed recovery (after hours), yet processing the recovery immediately and without waiting to receive any response to her email." (*Id.*).

Once the employer answers its "relatively light burden" by articulating a legitimate reason for the unfavorable employment decision, the presumption of discrimination has now "dropped out of the picture." *Fuentes*, 32 F.3d at 763. The burden of production rebounds to the plaintiff to show by a preponderance of the evidence that the employer's explanation is pretextual. *See Mardell*, 31 F.3d at 1225, n. 6. The Court of Appeals for the Third Circuit has developed the following two-prong test (the "*Fuentes* test") that a plaintiff must meet to show pretext:

> [T]o defeat summary judgment when the [employer] [articulates] legitimate nondiscriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes*, 32 F.3d at 764. *See also Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) ("Put another way, to avoid summary judgment the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)."). The two prongs of the *Fuentes* test are distinct. The court, where appropriate, will

analyze both prongs of the *Fuentes* test simultaneously to determine whether sufficient evidence was presented by plaintiff to defeat defendant's motion for summary judgment.

To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, because "the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" *Fuentes*, 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 533 (3d Cir.), *cert. denied*, 510 U.S. 826 (1993)). Rather, the nonmoving plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (citations and internal quotations omitted.). *See Ezold*, 983 F.2d at 527 ("[P]laintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision.") (quoting *Billet v. CIGNA Corp.*, 940 F.2d 812, 828 (3d Cir. 1991)).

Frank advances a number of arguments in support of her contention that PNC's legitimate nondiscriminatory reason for her termination is pretextual. We will address each of these arguments separately.

We first address Frank's contention that PNC treated her more harshly as compared to other similarly situated employees, thus demonstrating a discriminatory animus. (Pl. Brief at 17). According to Frank, "situations like this, which were identical to the incident of July 28, 2010, and where a recovery was subsequently processed, happened 'all the time,' and did not result in termination." (*Id.* (citing Deringer Dep. at 18, 23). Frank does not, however, identify any similarly situated employees who were treated more favorably for the same offense. Although

11

Frank contends that Deringer and Wheeler should also have been terminated for other violations, such as failing to record a buy/sell transaction or mistakenly giving a customer extra money, (Frank's Counterstatement of Additional Undisputed Material Facts ¶¶ 69, 100), the record demonstrates that these employees had not, in fact, committed the offense of force balancing, *i.e.*, processing a recovery of a buy/sell transaction error.  Indeed, Deringer testified at her deposition that she "would go to a supervisor or [] management when we want to do a recovery" (Deringer Dep. at 16), and that Malick "would say once we had already accepted [the shortage or overage], . . . just let it go and the next day it will wash out," (*id.* at 23).  Wheeler also testified that "[t]here's a policy that states that [] a recovery cannot be done on like a buy/sell.  You just have to accept the difference at the end of the night and see what happens." (Deposition of Jamie Wheeler ("Wheeler Dep.") at 20).  Because Frank was terminated for *processing the recovery of* a buy/sell transaction error, (Atkinson Dep. at 12-13, 24-25), an offense that neither Deringer nor Wheeler committed, Frank's attempt to use these employees as comparators fails. *See Simpson v. Kay Jewelers*, 142 F.3d 639, 645–47 (3d Cir. 1998) (when utilizing a defendant's comparative treatment of others to raise an inference of discrimination the plaintiff "cannot selectively choose a comparator" who was not similarly situated, but instead must point to evidence that is probative of unequal treatment motivated by discriminatory animus.).

      We also note that PNC has supplied uncontradicted evidence to establish that between September 2009 and September 2011, PNC terminated a total of four other employees for force balancing in Frank's same market territory.  For example, Atkinson investigated and later terminated two employees, ages 24 and 29, in December 2009 for processing a buy/sell recovery of $3,999.99.  (Atkinson Decl. Exs. 6-7 at PNC 0667-0673 [Doc. No. 33-2 at 40-49]).  In August 2010, shortly after Frank's termination, Atkinson investigated a 55-year-old employee

for correcting a $100 buy/sell transaction error and instructing another employee to do the same. (*Id.* Ex. 8 at PNC 765 [Doc. No. 33-2 at 55]). The employee was ultimately terminated for force balancing. (*Id.*). On September 29, 2011, Peggy Atkinson again investigated and then terminated an employee, under the age of 30, for force balancing. (*Id.* Ex. 5 at PNC 806-807 [Doc. No. 33-2 at 35-36]).

We also reject Frank's contention that the lack of documentation surrounding PNC's investigation, and the fact that her punishment "did not fit the crime," is evidence of pretext. (Pl. Brief at 17, 22-23). The record evidence in this case establishes that Atkinson conducted an investigation, (Atkinson Decl. ¶¶ 11-20, Exs. 1-2), consulted with PNC upper management regarding the investigation, (*Id.* ¶ 20; Atkinson Dep. at 41-43), and provided her recommendation that Frank be discharged, (*id.*). The evidence further establishes that Atkinson's recommendation was in line with PNC policy regarding employee discipline for force balancing. (Atkinson Decl. at Ex. 3).

Frank further argues that in making its decision to terminate her, PNC disregarded the "mitigated circumstances" surrounding the July 28, 2010 incident, namely, that Frank purportedly received permission from Malick to process the recovery. (Pl. Brief at 18). Frank claims that Bernatowicz's refusal to "opine [at her deposition] whether [Frank] would not have been terminated if she had received permission to do the balancing from [Malick] creates an issue of material fact." (Pl. Brief at 23). We disagree. Even assuming Malick had simply said "okay" as claimed by Frank in response to her statement that she was going to process the recovery, the evidence establishes that Malick was not a decision-maker, (Malick Dep. at 34; Bernatowicz Dep. at 26), and, therefore, Malick's mindset is irrelevant. Furthermore, Frank has produced no evidence to suggest that either Atkinson or Bernatowicz were aware that Frank

13

claimed she received permission from Malick. Atkinson testified that Frank never mentioned that she received permission to process the recovery and that, according to Malick, Frank was advised not to process the recovery without contacting loss prevention (Atkinson Dep. at 36, 67). In sum, despite Frank's claim of alleged permission to process the recovery, she has failed to present any evidence that the actual decision-makers did not believe she intentionally violated PNC policy.

Frank also contends that PNC's lack of a policy prohibiting the conduct that she engaged in on July 28, 2010 lends support to her pretext argument. The evidence establishes, however, that PNC policy prohibits employees from processing an offsetting transaction for an overage or shortage, rather than accepting and recording the error. (Frank Dep. at 40-41, Ex. 5; Atkinson Decl. at Ex. 3). The evidence further establishes that an employee's violation of this policy "will result in **disciplinary action up and including discharge**." (*Id.*) (emphasis added). Frank does not dispute that she processed an offsetting transaction to account for her $500 shortage on July 28, 2010, as well as one to account for Deringer's overage. (Frank Dep. at 96-97, 100-101). Thus, it is apparent that Frank is merely quibbling with PNC's decisions regarding how it defines "force balancing." It is not for the Court to sit as a super human resources department and re-examine PNC's business decisions. *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("We do not sit as a super-personnel department that reexamines an entity's business decisions.") (citation omitted). Frank's disagreement over whether her conduct warranted termination is simply not probative of pretext. (Atkinson Decl. ¶ 19, Ex. 2).

Finally, we address Frank's argument that the very existence of Plaintiff's Exhibit B,[2] which purportedly documents a warning that Malick provided to Frank on March 15, 2010 for processing a recovery of a buy/sell error, is evidence of pretext. According to Frank, this document was fabricated after her discharge to provide additional support for her termination. (Pl. Brief at 13). Frank testified that she had, in fact, processed a recovery in or around February or March of 2010, but that she never received any reprimand or discipline as a result, nor had she seen the document prior to her deposition. (Frank Dep. at 46-49). PNC contends, on the other hand, that the document was created in March 2010 when the warning was issued and explains that it did not terminate Frank at that time because she was a legacy National City employee who was still in the process of learning PNC's policies and procedures. (Atkinson Dep. at 50-51). In any event, Frank's contention that this document raises an inference of pretext fails. The record reflects that PNC did not rely on this alleged earlier warning when it took the action to terminate her in August 2010. The sole reason PNC proffered at the time for Frank's termination was her processing a recovery to correct a buy/sell transaction error between her and Deringer on July 28, 2010, an act that Frank admits. (Atkinson Decl. ¶ 19; Frank Dep. at 96-97, 100-101).

Because Frank has failed to raise a triable issue of fact relative to pretext, we grant PNC's Motion for Summary Judgment as to Frank's age discrimination claim.

*Disability Discrimination Claim*

Frank also claims that she was terminated as the result of having informed Malick that she was suffering from MS. The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and

---

[2] This document is filed at ECF No. 36-4.

other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To make out a *prima facie* case of disability discrimination under the ADA, Frank must establish that she: (1) is disabled within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) has suffered an adverse employment action because of that disability. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006). A court reviewing a claim of discrimination under the ADA must apply the burden-shifting framework of *McDonnell Douglas*, 411 U.S. 792. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

Frank has not adduced sufficient evidence for a reasonable jury to find that PNC terminated her because of her MS and, thus, has failed to make out her *prima facie* case. Frank claims that Malick knew about her MS because, "[s]hortly before her termination, [Frank] advised Malick that she injected herself every Tuesday in order to treat her MS," (Pl. Statement of Facts ¶ 39). However, Frank confirmed that Malick was the only PNC employee whom she informed of her MS. (Frank Dep. at 131). As previously discussed, Malick did not make the decision to terminate Frank. (Malick Dep. at 33-34 ). There is no evidence to suggest that Atkinson, who investigated the force balancing incident and ultimately made the recommendation to terminate Frank, or Bernatowicz, who approved the decision to terminate her, were aware of Frank's MS. (Atkinson Decl. ¶ 21).[3] *See Sever v. Henderson*, 220 F. App'x 159, 161 (3d Cir. 2007) (plaintiff failed to show that the employer knew or had reason to know that he was substantially limited in a major life activity at the time employer determined that he should be fired). Because Frank has failed to present any evidence that the relevant decision-

---

[3] PNC's internal records also did not reflect that Frank had a disability. For example, the Employee Relations Information Center ("ERIC") hotline entry created in connection with the July 28, 2010 incident states "UNKNOWN" as to whether Frank has a disability. (Atkinson Dep. Ex. 5 at PNC752).

makers were aware of her MS, she cannot establish a *prima facie* case of disability discrimination. *Turner*, 440 F.3d at 611. Accordingly, the court will grant summary judgment in favor of PNC on Frank's disability discrimination claim.

## IV.     CONCLUSION

For the foregoing reasons, PNC's Motion for Summary Judgment is granted. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA FRANK, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 12-34 Erie |
| ) | |
| v. ) | |
| ) | |
| THE PNC FINANCIAL SERVICES ) | |
| GROUP, INC., ) | |
| ) | |
| Defendant. ) | |

**ORDER**

AND NOW, this 15th day of August, 2013, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment [ECF No. 29] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, PNC Bank, N.A. (named in the Complaint as PNC Financial Services Group, Inc.), and against Plaintiff, Patricia Frank.

The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin
Chief United States District Judge

cm:   All parties of record